IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JIMMY EARL HALL, #103508, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:13-cv-229-WHA |
| | ) | |
| CARTER DAVENPORT, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I.  INTRODUCTION AND PROCEDURAL HISTORY

This cause is before the court on a 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Jimmy Earl Hall, a state inmate, on April 8, 2013.[1]  In this petition, Hall challenges a conviction for solicitation to commit murder imposed upon him by the Circuit Court of Houston County, Alabama on January 13, 2011, after trial and a jury verdict.[2]  On this same date, the court sentenced Hall, as a habitual felony offender, to life imprisonment without parole.

---

[1] A *pro se* inmate's petition is deemed to be "filed" on the date it is delivered to prison officials for mailing. *Houston v. Lack*, 487 U.S. 266, 271–72 (1988); *Adams v. United States*, 173 F.3d 1339, 1340–41 (11th Cir. 1999).  The documents filed by Hall indicate that he submitted the habeas petition for mailing on April 8, 2013. Doc. 1 at 15.  The court therefore considers April 8, 2013 to be the date of filing.

[2] The applicable code section, Alabama Code § 13-4-1(a) (1975), provides that:

> A person is guilty of criminal solicitation if, with the intent that another person engage in conduct constituting a crime, he solicits, requests, commands or importunes such other person to engage in such conduct.  A person may not be convicted of criminal solicitation upon the uncorroborated testimony of the person allegedly solicited, and there must be proof of circumstances corroborating both the solicitation and the defendant's intent.

In addition, "[c]riminal solicitation is a Class A felony if the offense solicited is murder." Ala. Code § 13-4-1(f)(1) (1975).

Hall filed a direct appeal of his solicitation-to-commit-murder conviction.  In this appeal, Hall argued that the trial court erred by failing to grant his motion for judgment of acquittal because the State failed to present evidence corroborating the testimony of the jailhouse informant allegedly solicited to commit the murder.  In support of this argument, Hall claimed that the State presented no evidence corroborating the informant's testimony with respect to either his solicitation of the murder or his intent to have the informant commit the crime. Doc. 13-3 at 12–20.[3]  On October 21, 2011, the Alabama Court of Criminal Appeals affirmed Hall's murder conviction in an unpublished opinion:

> Hall was convicted of soliciting a fellow inmate, Charles Osborne, to murder Peggy Shannon Hall, who was married to Hall's father when he passed away.  When Hall's father died, he left Peggy a life interest in approximately two acres of land and the structures on it, which included the wooden house where they had lived, a barn, a pump house, and a trailer.
>
> Hall's father left a nearby house to Hall and his brother. Peggy testified that in November 2009, she discovered a hose attached to her pump house that was running underground and carrying water onto Hall's property. Peggy pulled the hose out of the ground and cut it off at the fence near Hall's yard. Over the next month, Peggy discovered the hose reconnected to her pump house on at least eight different occasions.  Peggy cut the hose each time she found it reconnected.  Peggy testified that she placed a lock on the pump house; however, someone removed the lock, reconnected the hose, and wrapped a chain around the pump house so that she could not get into the pump house to cut off the pump.  At that point, Peggy found a note on the pump house that stated: "Cut my hose again and you will go to jail."  That note was signed by "Jimmy."  After discovering that note, Peggy filed a police report against Hall, and he was charged with criminal mischief and trespass.
>
> On May 9, 2010, David Baker, the staff chaplain at the Houston County Jail, informed Osborne that his father had passed away.  After Baker

---

[3] All document and page numbers referenced herein are those assigned by this court in the docketing process.

talked to Osborne about his father's death, Osborne asked Baker what he needed to do if he was aware of a situation where somebody might be harmed.  Baker told Osborne that he needed to notify the authorities.  Baker then contacted the authorities for Osborne, and Osborne [advised them that Hall had on several occasions requested that he murder Peggy Shannon Hall].  Donovan Arias, an investigator with the Houston County Sheriff's Department, was one of the officers that discussed the situation with Osborne.  Arias testified that, after discussing the situation with Osborne, the officers placed a wired recording device on him and placed him back into a cell with Hall so that they could record discussions concerning Hall's solicitation [of Osborne] to murder Peggy.

Osborne testified that Hall approached him about killing Peggy while he and Hall were sharing a cell.  According to Osborne, Hall discussed killing Peggy almost every day for five or six weeks before Osborne notified the authorities.  Osborne testified that Hall wanted him to spray lighter fluid around the roof of Peggy's house and set it on fire around 2 a.m. while Peggy was asleep.  Hall gave Osborne directions to Peggy's house and drew a map of the property around Peggy's house.  Hall told Osborne where to park his car so that it would not be noticed, and Hall drew Osborne an escape route.

Hall informed Osborne that Peggy lived with a little dog.  Osborne testified that Hall offered to pay him $1,000, so that he could bond out of jail.  However, Osborne never bonded out of jail.  Hall also offered to pay Osborne with $5,000 worth of cocaine.

The audio recording of the wired conversation between Hall and Osborne was played for the jury.  [Two separate] transcript[s] of the conversation [were] also provided to the jury.  In that recorded conversation Hall discussed paying Osborne to spray a flammable liquid in vents under the eaves of a house and set it on fire early in the morning.  Hall also mentioned igniting a propane tank that is near the house.  Hall referred to a drawing of the property surrounding Peggy's house and described where Osborne should park and how he should approach the house so that he can set the house on fire and escape without being detected.  The recorded conversation referred to burning up the house with a woman inside.

Hall testified in his own defense that he wanted Osborne to burn a playhouse on his property, not Peggy's house.  Hall testified that he was trying to sell his property and that he wanted Osborne to burn the playhouse because, Hall said, Osborne had manufactured methamphetamine in the playhouse and Hall wanted to dispose of any illegal substances on the

property.   Osborne testified that he had never manufactured methamphetamine.  Hall denied soliciting Osborne to murder Peggy.

At the close of the State's case, Hall's counsel moved for a judgment of acquittal, stating:

"Let the record reflect that the prosecutor has rested the State's case and we're in court absen[t] of the jury.  And I move for a judgment of acquittal, and as grounds thereof assign following separately and severely.  The State has failed to make out a prima facie case.  The State has failed to prove each and every element of the crime of solicitation.  The State has failed to carry the burden of proof.  And there is a lack of evidence to the degree that the case does not warrant to be given to the jury. That's it."

The trial court denied that motion.  At the close of all the evidence, Hall's counsel renewed that identical motion for judgment of acquittal, and the trial court denied the motion again.  On January 13, 2011, the jury found Hall guilty of criminal solicitation to commit murder, and the trial court sentenced him to life in prison without the possibility of parole.  On January 21, 2011, Hall filed a motion for a new trial.  The trial court denied that motion on January 27, 2011.  On March 4, 2011, Hall filed his notice of appeal to this Court.

On appeal, Hall alleges that the trial court erroneously denied his motion for a judgment of acquittal because, he says, the State did not corroborate Osborne's testimony.  Specifically, Hall alleges that the State did not present evidence to corroborate both the act of solicitation and his intent to influence Osborne to commit a crime, as required by § 13A-4-1(a), Ala. Code 1975.  However, Hall did not preserve this claim for appellate review, and the claim is without merit.

"'''[T]o preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof. . . .  An issue raised for the first time on appeal is not correctly before this court." *Buice v. State*, 574 So. 2d 55, 57 (Ala. Crim. App. 1990).' *McKinney v. State*, 654 So. 2d 95, 99 (Ala. Crim. App. 1995)." *Merchant v. State*, 724 So. 2d 65 (Ala. Crim. App. 1998).

Similar to the corroboration requirement found in § 13A-4-1(a), Ala. Code 1975, § 12-21-222, Ala. Code 1975, requires that, in the prosecution of a felony, the testimony of an accomplice must be corroborated by other evidence tending to connect the defendant with the commission of the offense.  Concerning the preservation of a claim that the rule set forth in § 12-21-222 was violated, this Court has held that "a motion for a judgment of acquittal that challenges the sufficiency of the evidence only generally, i.e., that the State failed to prove a prima facie case or words to that effect, does not preserve for review the specific claim that an accomplice's testimony was not sufficiently corroborated." *Marks v. State*, 20 So. 3d 166, 172 (Ala. Crim. App. 2008).

In the present case, Hall's motion for a judgment of acquittal only generally alleged that the State failed to prove a prima facie case of criminal solicitation.  That motion did not specifically allege that the State did not corroborate Osborne's testimony.  We hold that just as a defendant must specifically preserve a claim concerning an alleged violation of the statutory rule that requires corroboration of accomplice testimony, a defendant must specifically preserve a claim concerning an alleged violation of the statutory rule that requires the State to corroborate the testimony of the person allegedly solicited in a prosecution for criminal solicitation.  Because Hall did not specifically raise in the trial court his claim that the State did not corroborate Osborne's testimony, that claim is not preserved for our review.

Moreover, assuming arguendo that Hall's claim [with respect to lack of corroborative testimony] is preserved for appellate review, the claim is without merit.  In *Thornton v. State*, 570 So. 2d 762 (Ala. Crim. App. 1990), this Court held:

> "To prove solicitation, [§ 13A-4-1, Ala. Code 1975] requires corroboration of both the communication (or the act of solicitation) and the intent to influence the solicitor to commit a crime. The corroborating testimony, however, does not need to be direct testimony that the accused did the specified acts. Rather, it is sufficient if the 'corroborative evidence tend[s] to link the accused with the offense.'"

*Thornton*, 570 So. 2d at 769 (quoting *Kimbrough v. State*, 544 So. 2d 177, 181 (Ala. Crim. App. 1989)).  This Court has held that the testimony of the person allegedly solicited may be corroborated by a

recording of that person's conversation with the defendant.   *See Springfield v. State*, 580 So. 2d 88, 90 (Ala. Crim. App. 1991) (holding that the evidence was sufficient to sustain the defendant's conviction for criminal solicitation of a controlled substance based on the testimony of an undercover officer from whom the defendant solicited drugs, which was corroborated by a recording of the conversation and by testimony of another undercover officer); *see also Thornton*, 570 So. 2d at 769 (same).

In the present case, Osborne's testimony was sufficiently corroborated by the audio recording of his conversation with Hall. That recording contained the substance of the material communication between Osborne and Hall. From that recording, the jury could confirm Osborne's testimony indicating that Hall solicited him to murder Peggy and that Hall intended for Osborne to act on that solicitation by burning down Peggy's house with her in it. Therefore, Osborne's testimony was sufficiently corroborated and, thus, the trial court did not err in denying Hall's motion for a judgment of acquittal.

Based on the foregoing, the judgment of the trial court is affirmed.

Doc. 9-5 at 1–6 (citations to record and footnote omitted). Hall did not further appeal his conviction for criminal solicitation to commit murder, and the Alabama Court of Criminal Appeals issued the certificate of judgment on November 9, 2011. Doc. 9-6.

On June 23, 2012, Hall filed a state post-conviction petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure with the Circuit Court of Houston County, Alabama. In this petition, Hall alleged: (1) trial counsel was ineffective for failing to file a motion to suppress the recording of the conversation with Osborne, including all four transcribed versions, on grounds that (i) he was being held illegally when the recording was made, and, if in legal custody, he should have been advised of his *Miranda v. Arizona*, 384 U.S. 436 (1966), rights at the beginning of the conversation; (ii) he was entrapped by

government agent Charles Osborne; and (iii) no court had issued a warrant authorizing the recording which was a violation of his Fourth Amendment rights; and (2) appellate counsel provided ineffective assistance by refusing to provide him a copy of the trial transcript so that he could continue the direct appeal process. Doc. 9-1 at 14–15.  Hall argued that trial counsel's failure to challenge the admission of the recording and transcriptions prejudiced him "because without the taped conversation and its transcribed version there is absolutely no evidence to [support a conviction]." Doc. 9-1 at 14.

On July 5, 2012, the trial court issued an order denying Hall relief on the claims raised in his Rule 32 petition. Doc. 9-1 at 22–23.  The trial court's order addressed Hall's claims as follows:

> The Defendant seeks a free transcript of his trial.  He is not entitled to a free transcript [in Rule 32 proceedings]. *Ex parte Powell*, 641 So. 2d 772 (Ala. 1994).  Further, the record establishes that a transcript of his trial was prepared for his direct appeal.
>
> The Defendant claims in his petition that his right against self-incrimination was violated by admission of recordings of a fellow inmate who was assisting law enforcement in which the Defendant made statements that formed the crux of the State's case for solicitation to commit murder.  He alleges that his trial attorney was ineffective on this issue.  The Defendant was in custody at the county jail on an unrelated matter when he engaged in the conversations that led to his arrest and conviction for solicitation to commit murder.  This type of claim has been consistently rejected by the United States Supreme Court and the Alabama appellate courts. *Hoffa v. United States*, 385 U.S. 293 (1966) ("this Court nor any member has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it"); *United States v. White*, 401 U.S. 745 (1971) ("one contemplating illegal activities must realize and risk that his companions may be reporting to the police"); *Bates v. State*, 549 So. 2d 601 (Ala. Crim. App. 1989) ("false friend" situation is not a constitutional violation).

There is no constitutional issue [relative to a seizure of information, self-incrimination or the right to counsel] when the Defendant, as in this case, has not been charged with a crime related to his jail-house conversations with a "false friend." *Quince v. State*, 721 So. 2d 245 (Ala. Crim. App. 1998) ("Quince was in jail on drug charges that were unrelated to the present case [murder]; he had not been charged with or arrested for Beno's murder when he confessed to committing the murder); *Crawford v. State*, 377 So. 2d 145 (Ala. Crim. App. 1979) ("To hold that the use of a volunteer informant in the investigation of a crime in progress is an illegal interrogation of a defendant would unduly restrain the basic duty of law enforcement. We do not think the Sixth Amendment confers the right to assistance of counsel during the commission of a crime."). As a result, the Defendant has no right to counsel or constitutional expectation of privacy when actively engaging in criminal activity. This claim is facially unmeritorious.

The Defendant in conclusory language with no evidence claims that he was being held illegally at the time he made the jail-house statements that led to his conviction for solicitation to commit murder [due to his having been granted pre-trial diversion in one of his criminal cases—a 2010 misdemeanor conviction for criminal mischief and trespass]. . . . [T]he records . . . of the Houston County Circuit Court show that the Defendant was arrested on or about March 11, 2010 and placed in the Houston County Jail for revocation of his probation on a charge of unlawful possession of a controlled substance (CC 2006-935) [for which he received a 15-year sentence on May 8, 2009] and he has been in continuous custody since then pursuant to lawful court orders. He claims that Judge Steensland ordered his release [on the criminal mischief and trespass conviction] and the State failed to comply with this order. The Defendant has not offered any written order of Judge Steensland authorizing his release [regarding the possession conviction] and the record does not disclose any such order. Furthermore, even if some issue existed regarding the Defendant's incarceration such would not grant him immunity to engage in further criminal exploits.

Accordingly, the Court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the Defendant to relief under Rule 32[.]

Doc. 9-1 at 22–23.

Hall appealed the denial of his Rule 32 petition, raising the same claims as those presented to the trial court and arguing that the trial court abused its discretion in summarily

dismissing his petition.   The Alabama Court of Criminal Appeals issued a memorandum

opinion on November 30, 2012, and decided the issues adversely to Hall.  Doc. 9-2.  The

relevant portion of this opinion reads as follows:

> Hall filed the standard Rule 32 form found in the appendix to Rule 32, and attached a supplement setting out his detailed claims.  On the standard form, Hall checked the following ground: "12(A)(9) Denial of effective assistance of counsel."

> In his supplement to the petition, Hall raised, and argued on appeal, the following claims: Claim 1, that his trial counsel was ineffective for failing to file a motion to suppress his taped statement[] to a jail-house informant.  And, Claim 2, that he is entitled to a free copy of the transcript of his trial and that appellate counsel was ineffective for failing to forward him a copy of it [after his appeal of right to this court was denied].

> Without waiting for a response by the State, the circuit court issued an order dismissing the petition finding that it was without merit and lacking specificity.

> On appeal, Hall reiterates the claims raised in his petition:

> Claim 1

> Hall failed to plead his first claim with specificity.  Hall alleged that he was not in legal custody and was entrapped by his cellmate who acted as a government agent and that his counsel should have filed a motion to suppress the taped conversations Hall had with his cellmate wherein Hall solicited his cellmate to commit murder.  However, Hall pleads only conclusions and does not specify what his cellmate said to him which amounted to entrapment.  Hall also argued that if he was in legal custody, *Miranda* warnings should have been given.

> In his brief on appeal, Hall completely fails to cite any authority regarding his claim that he was entrapped and his assertion that *Miranda* warnings should have been given.  Hall also fails to advance any argument showing how his counsel's actions at trial amounted to ineffective assistance.  As a result his argument regarding Claim 1 is waived.

Rule 28(a)(10), Ala. R. App. P., requires that an argument contain "the contentions [of] an appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on."   Further, "[a]uthority supporting only 'general propositions of law' does not constitute a sufficient argument for reversal." *Beachcroft Properties, LLP v. City of Alabaster*, 901 So. 2d 703, 708 (Ala. 2004), quoting *Geisenhoff v. Geisenhoff*, 693 So. 2d 489, 491 (Ala. Civ. App. 1997).  "An appellate court will consider only those issues properly delineated as such and will not search out errors which have not been properly preserved or assigned.  This standard has been specifically applied to briefs containing general propositions devoid of delineation and support from authority or argument." *Ex parte Riley*, 464 So. 2d 92, 94 (Ala. 1985) (citations omitted). *See also Spradlin v. Spradlin*, 601 So. 2d 76, 78–79 (Ala. 1992) (holding that citation to a single case with no argument as to how that case supports the appellant's contention on appeal was insufficient to satisfy Rule 28(a)(5), Ala. R. App. P., now Rule 28(a)(10), Ala. R. App. P.); and *Hamm v. State*, 913 So. 2d 460, 486 (Ala. Crim. App. 2002) (noncompliance with Rule 28(a)(10) has been deemed a waiver of the claims on appeal).

Because Hall has failed to properly argue this claim, a discussion of the requirements of *Strickland v. Washington*, 466 U.S. 668 (1984), and an analysis of his claim of ineffective assistance of counsel would be superfluous.

## Claim 2

In Claim 2, Hall argued that his appellate counsel was ineffective because, after his appeal was decided, he had requested that his appellate counsel forward to him the trial record containing the transcript of the trial and counsel had not done so.  Hall alleged he needed the trial record so that he could [proceed with rehearing and petition the Alabama Supreme Court for discretionary review of his appeal and] prepare a Rule 32 petition.  Hall does not make any claim that the actions of his appellate counsel during the appeal itself amounted to ineffective assistance of counsel.

Rule 32.1 sets out the scope of relief available in a Rule 32 case.

"Rule 32.1.     Scope of Remedy

"Subject to the limitations of Rule 32.2, any defendant who has been convicted of a criminal offense may institute

a proceeding in the court of original conviction to secure appropriate relief on the ground that:

"(a) The constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.

"(b) The court was without jurisdiction to render judgment or to impose sentence.

"(c) The sentence imposed exceeds the maximum authorized by law or is otherwise not authorized by law.

"(d) The petitioner is being held in custody after the petitioner's sentence has expired.

"(e) Newly discovered material facts exist which require that the conviction or sentence be vacated by the court[.]

"(f) The petitioner failed to appeal within the prescribed time from the conviction or sentence itself or from the dismissal or denial of a petition previously filed pursuant to this rule and that failure was without fault on the petitioner's part."

Because Hall's claim [regarding counsel's failure to provide him the transcript] was clearly outside the purview of Rule 32.1, the trial court's dismissal of this claim was proper.

. . . .

Because the petitioner's claims were precluded, or were without merit, summary disposition was appropriate.

For the foregoing reasons, the judgment of the circuit court is due to be affirmed.

Doc. 9-2 at 2–5.

Hall filed an application for rehearing, and the Alabama Court of Criminal Appeals overruled this application. Hall then submitted a petition for writ of certiorari to the

Alabama Supreme Court. Doc. 9-4.  The Supreme Court denied this petition and issued the certificate of judgment on February 15, 2013. Doc 9-3.

## II.  STATEMENT OF CLAIMS AND RESPONSES

In the instant 28 U.S.C. § 2254 habeas petition, Hall asserts the following claims for relief:

1.      Appellate counsel provided ineffective assistance by failing to provide Hall with a copy of the free transcript furnished by the State for use on direct appeal so that Hall could continue his appeal to the Alabama Supreme Court and for the purpose of filing a Rule 32 petition.

2.      The State failed to provide a second free transcript to Hall during the Rule 32 proceedings.

3.      Trial counsel denied Hall the right to effective assistance when he failed to file a motion to suppress Hall's recorded conversation with Osborne and the two State-prepared transcripts of the conversation, which were admitted at trial, on the basis that (i) Hall was not in legal custody at the time of the recording, (ii) Hall was entrapped by government agent Charles Osborne, and (iii) the recording was obtained without a warrant.

4.      The testimony of Charles Osborne was insufficient to support his conviction for criminal solicitation to commit murder because it was not corroborated by any other evidence.

5.      The State failed to establish a proper chain of custody for admission of the

recording of Hall's conversation with Osborne, identified as State's Exhibit 8, because the individual responsible for downloading the recording from the digital device to a compact disc ("CD") did not testify.

6.      The prosecutor failed to provide Hall (i) a copy of a loan agreement signed by Hall and Osborne that referenced the provision of funds from Hall to Osborne for payment of Osborne's bond; (ii) a copy of the initial 58-page transcript of the recording of Hall's conversation with Osborne; (iii) a transcript of an interview conducted with Hall on May 10, 2016; (iv) a transcript of a statement provided by Osborne on May 9, 2010 in which he first advised law enforcement officials of Hall§'s requests that he murder Peggy Shannon Hall; and (iv) a copy of a letter written in May 2010 by Osborne to Mr. Valeska in which Osborne purportedly concedes prior drug use, reveals details of the sexual preference of his son, and references his mental health issues.[4]

7.      The prosecutor misstated that the CD containing Osborne's May 9, 2010 statement, State's Exhibit 14, had not been transcribed.

---

[4] Hall knew of the loan agreement and its contents in as much as he acknowledges drafting and signing the document. Doc. 18 at 4.  In addition, the record establishes that the State provided a copy of the CD containing the conversation between Hall and Osborne regarding solicitation of the murder of Peggy Shannon Hall, State's Exhibit 8, to defense counsel well before trial. Doc. 24-4 at 68.  The court notes that throughout the trial this exhibit was described typically as either a "CD" or "tape."  It was also described as the "Jimmy Hall wire," "the Charles Osborne wire" and the "wire conversation between Hall and Osborne."  After the State moved to admit the disc into evidence, and before playing the recording for the jury, the State clearly identified this exhibit as a recording of the wire conversation between Hall and Osborne.  Other descriptions of the exhibit fail to undermine its admissibility or authenticity.  Moreover, the recordings of the statements made by Hall and Osborne were both admitted at trial without objection as State's Exhibits 7 and 14, respectively.  With respect to suppression of the letter, Osborne testified that (i) he had written the prosecutor seeking release from lock down because he did not like being in a single cell 23 hours per day, Doc. 24-5 at 57; (ii) he previously used drugs, including cocaine, methamphetamine, and marijuana, Doc. 24-5 at 41; and (iii) his son was a homosexual, which concerned him, but he was not homosexual, Doc. 24-5 at 45.

8.      He is actually innocent of the crime for which he stands convicted.

Doc. 1 at 20–23; Doc. 18 at 2–8.

Hall maintains that trial counsel's failure to challenge the admission into evidence of the CD containing his conversation with Osborne and the two transcripts of that conversation prejudiced his case because this was the only evidence corroborating Osborne's testimony, and without this evidence he would not have been convicted of criminal solicitation to commit murder.[5]  Hall further alleges that he "was prejudiced [by appellate counsel's refusal to provide him the transcript] because his direct appeal claims are precluded" from federal review due to his failure to complete the direct appeal process. Doc. 1 at 23.

In their answers to the habeas petition, the Respondents argue that Hall is entitled to no relief from the court.  Specifically, they maintain that Hall failed to exhaust properly the lack of corroborating evidence, chain of custody, and prosecutorial misconduct claims in the state courts as required by applicable procedural rules. *See O'Sullivan v. Boerckel*,

---

[5] A thorough review of the record indicates that the State prepared at least three transcripts of the conversation between Hall and Osborne, with each transcript containing references to "inaudible" statements.  The initial transcript prepared by the State contained 50-plus pages, Doc. 18-4 (Pet.'s Ex. D to the Amendment), a subsequent transcript contained 70 pages, Doc. 24-2 at 12–82 (State's Trial Ex. 8), while a separate, later transcription contained 80-plus pages (State's Trial Ex. 16).  Each subsequent transcript contained fewer references to "inaudible" statements.  Although the trial court admitted two of the transcripts into evidence, it made clear that these transcripts were admitted only as an aid to the jury and repeatedly advised the jury that if there was any discrepancy in the transcripts and the recording they must always refer to the recording because it constituted the actual evidence of the conversation. Doc. 24-5 at 88–90; Doc. 24-7 at 24.  The trial court also advised defense counsel that if any portion of the transcript misinterpreted the recorded conversation he should immediately raise an objection. Doc. 24-5 at 90–92. The State then played the recording for the jury.  Neither party objected while the jury heard the recording. Doc. 24-5 at 94.  In addition, during his testimony, Hall was permitted to testify to statements he claimed were inaudible or not contained on the recording, and, as a result, were not contained in any of the transcripts.

526 U.S. 838, 845 (1999) (holding that "state prisoners must give the state courts one full

opportunity to resolve any constitutional issues by invoking one complete round of the

State's established appellate review process," including review by the state's court of last

resort, even if review in that court is discretionary); *Henderson v. Campbell*, 353 F.3d 880,

891 (11th Cir. 2003) (holding that a prisoner must properly raise and exhaust his claims in

the state courts to avoid preclusion of review in federal habeas action).  To provide the

state courts with the a full and fair opportunity to address Hall's claims,

> [the] exhaustion doctrine requires the petitioner to "fairly present" his federal
> claims to the state courts in a manner to alert them that the ruling under
> review violated a federal constitutional right. *Duncan v. Houston*, 513 U.S.
> 364, 365-66 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).
> Exhaustion is not satisfied "merely" if the petitioner presents the state court
> with "all the facts necessary to support the claim" or even if a "somewhat
> similar state-law claim was made." *Kelley v. Sec'y for Dep't of Corr.*, 377
> F.3d 1317, 1344 (11th Cir. 2004) (citation omitted).  The petitioner must
> instead "present his claims to the state courts such that they are permitted the
> 'opportunity to apply controlling legal principles to the facts bearing upon
> the constitutional claim.'" *Id.* (quoting *Picard*, 404 U.S. at 277).

*Pearson v. Sec'y for Dep't of Corr.*, 273 F. App'x 847, 849–50 (11th Cir. 2008).

Upon thorough review of the answers filed by the Respondents, the state court

records, and applicable federal law, the court finds the established procedural defaults are

as follows:

(1)     The chain of custody and prosecutorial misconduct claims are procedurally

defaulted because Hall never presented those claims to the state courts for review.

(2)     The claim regarding lack of corroborating evidence to support the testimony

of Charles Osborne is procedurally defaulted because the last state court to address the

15

issue deemed it defaulted.  On direct appeal, the Alabama Court of Criminal Appeals found that "[b]ecause Hall did not specifically raise in the trial court his claim that the State did not corroborate Osborne's testimony, that claim is not preserved for our review." Doc. 9-5 at 5; *see Atkins v. Singletary*, 965 F.2d 952, 955 (11th Cir. 1992) (citations omitted) ("Federal review of a petitioner's claim is barred by the procedural-default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and that bar provides an adequate and independent state ground for denying relief.").  In addition, even when a state court addresses the substantive merits of a defaulted claim in an alternative holding, the claim remains barred from federal review. *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) ("[A]lthough the Alabama Court of Criminal Appeals could have been more explicit, its opinion rested on procedural default and failure to state a claim as alternative grounds and therefore fits within the exception reserved in footnote 10 of the Supreme Court's opinion in *Harris*[.]").

The Respondents further argue that:

(1)     The State provided the petitioner a copy of his trial transcript for purposes of pursuing his appeal of right to the Alabama Court of Criminal Appeals, and therefore no constitutional violation occurred with respect to Hall's allegation that he did not have a copy of the transcript for purposes of continuing his direct appeal or filing his state post-conviction petition.

(2)     The claims of ineffective assistance of trial and appellate counsel provide no basis for relief because Hall has failed to meet his burden of proof under *Strickland v. Washington*, 466 U.S. 668 (1984).

(3)     Hall has not established his actual innocence in accordance with the standard set forth in *Schlup v. Delo*, 513 U.S. 298 (1995).

The record reveals that the ineffective assistance of trial counsel, lack of corroborating testimony/sufficiency of the evidence, and lack of transcript claims do not entitle Hall to federal habeas relief because the state courts properly adjudicated those claims on the merits. *Price v. Vincent*, 538 U.S. 634, 638 (2003) ("A habeas petitioner whose claim was adjudicated on the merits in state court is not entitled to relief in federal court unless he meets the requirements of 28 U.S.C. § 2254(d)."). Under the provisions of 28 U.S.C. § 2254(d), federal habeas relief from a state court judgment may not be granted unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Finally, the assertion of actual innocence, to the extent it is presented as an independent claim, provides no basis for relief to Hall.

In summary, upon review of the § 2254 petition, as amended, the answers of the Respondents, Hall's response to the answers, the state court record, opinions issued by the state courts, and applicable federal law, this court finds that no evidentiary hearing is

required, *see* Rule 8(a), Rules Governing Section 2254 Cases in United States District Courts, and concludes that the petition is due to be DENIED.

## III.  DISCUSSION

### A.  **Procedurally Defaulted Claims**

Hall challenges the admissibility of the CD containing the recording of his conversation with Charles Osborne, a jailhouse informant, in which the solicitation of the murder of Hall's stepmother is discussed on the ground that the State failed to establish an adequate chain of custody.  In support of this claim, Hall complains that the individual who downloaded the recording from the recording device to the computer and then onto the CD did not testify at trial.  Hall also contends that the prosecutor withheld various documents from him—a loan agreement he drafted, which was signed by him and Osborne; the initial transcript of the CD recording of the jailhouse conversation with Osborne; a transcript of Osborne's statement to law enforcement officials advising that Hall had solicited him to murder Peggy Shannon Hall on multiple occasions; and a copy of a letter written by Osborne to Mr. Valeska.  The Respondents maintain that these claims are procedurally barred from review because Hall never presented the claims to the state courts and has no available state remedy for now raising the claims. *See Boerckel*, 526 U.S. at 845; *Henderson*, 353 F.3d 880.  Specifically, Hall did not raise these claims during trial, on direct appeal, or in his Rule 32 petition.  The Respondents also argue that the lack of corroborating evidence claim is procedurally defaulted because Hall failed to raise this specific claim at trial and the Alabama Court of Criminal Appeals, the last state court to

address the issue, deemed it barred from review for such failure.  Hall concedes the chain of custody, prosecutorial misconduct, and lack of corroborating evidences claims are procedurally defaulted but argues that this court should address these claims under the "cause and prejudice" exception to the procedural bar. Doc. 36 at 1–3.  Hall also asserts that he is actually innocent of the offense of which he is convicted, which warrants review of these claims because the failure to do so would result in a fundamental miscarriage of justice. Doc. 36 at 3.

As a prerequisite to filing a federal habeas action, the petitioner must have properly exhausted state-court remedies, either on direct appeal or in a state post-conviction petition, *see* 28 U.S.C. § 2254(b), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Houston*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citation omitted)); *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1342–44 (11th Cir. 2004) (holding that petitioner cannot raise claims in federal court if those claims, including the factual basis for the claims, were not first exhausted in state court).  To exhaust state remedies in accordance with the exhaustion requirement, the petitioner must fairly present every issue raised in his federal petition to each appropriate state court, including the state's highest court, alerting that court to the federal nature of the claim and a statement of the facts that entitle him to relief. *Duncan*, 513 U.S. at 365-366; *Boerckel*, 526 U.S. at 845; *Picard*, 404 U.S. at 277–278.

It is not sufficient merely that the federal habeas petitioner has been
through the state courts, *Picard v. Connor*, 404 U.S. 270, 275–76 (1971), nor

> is it sufficient that all the facts necessary to support the claim were before the state courts or that a somewhat similar state-law claim was made, *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citations omitted).  The petitioner must present his claims to the state courts such that they are permitted the "opportunity to apply controlling legal principles to the facts bearing upon (his) constitutional claim." *Picard*, 404 U.S. at 277 (alteration in original).

*Kelley*, 377 F.3d at 1343–44.  The court further advised that "[t]o ensure exhaustion, petitioners must present their claims in this manner of clarity throughout 'one complete round of the State's established appellate review process.'" *Id*. at 1345 (quoting *Boerckel*, 526 U.S. at 845).

It is undisputed that Hall failed to exhaust the chain of custody and prosecutorial misconduct claims in the state courts and that no remedy remains before those courts for him to obtain review of those claims.  Hall acknowledges that the Alabama Court of Criminal Appeals determined that his corroborating-evidence claim was procedurally defaulted but argues that the appellate court's alternative ruling on the merits renders "the issue not barred" from review by this court. Doc. 36 at 2.  As previously set forth, this latter assertion is foreclosed by well-settled law. *See Harris*, 489 U.S. at 264 n.10 (noting that state court's explicit reliance on procedural default remained effective to bar federal review of the defaulted claim despite the state court reaching the merits of the claim in an alternative holding).  The aforementioned claims are therefore procedurally defaulted.

> Procedural default will be excused only in two narrow circumstances. First, a petitioner may obtain federal review of a procedurally defaulted claim if he can show both "cause" for the default and actual "prejudice" resulting from the default. *See Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Sykes*, 433 U.S. at 87.  "To establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169

F.3d 695, 703 (11th Cir. 1999). To establish "prejudice," a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. *Id.*; *Crawford v. Head*, 311 F.3d 1288, 1327–28 (11th Cir. 2002). Second, a federal court may also grant a habeas petition on a procedurally defaulted claim, without a showing of cause or prejudice, to correct a fundamental miscarriage of justice. *Murray*, 477 U.S. at 495-96. A "fundamental miscarriage of justice" occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent. *Id.*

*Henderson*, 353 F.3d at 892.

The "precise content" of "prejudice" was left for development in later cases. *Sykes*, 433 U.S. at 91. "The terms 'cause' and 'actual prejudice' are not rigid concepts; they take their meaning from the principles of comity and finality. . . . In appropriate cases those principles must yield to the imperative of correcting a fundamentally unjust incarceration." *Engle v. Isaac*, 456 U.S. 107, 135 (1982). "[T]he burden of justifying federal *habeas* relief for state prisoners is greater than the showing required to establish plain error on direct appeal. *Henderson v. Kibbe*, 431 U.S. 145 (1977); *United States v. Frady*, [456 U.S. 152, 166 (1982)]." *Id.*

*Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991).

## 1.      *Cause and Prejudice Analysis*

In an effort to demonstrate cause for his defaults, Hall asserts that (i) trial counsel failed to challenge the chain of custody and lack of corroborating testimony during trial, and (ii) appellate counsel did not exhaust the corroborating evidence claim during the direct appeal process and denied him a copy of the trial transcript so that he could establish on appeal that this claim was not defaulted while proceeding *pro se*. Doc. 36 at 1–3. Hall further argues that his lack of a transcript during the Rule 32 proceedings constitutes cause for his failure to raise these claims and the claim of prosecutorial misconduct in those

proceedings. Doc. 36 at 1.  Hall also argues that he is prejudiced because a favorable ruling

on any of these claims would have resulted in a verdict in his favor.

For purposes of this Recommendation, the court assumes that Hall has demonstrated

cause for his procedural defaults.  Thus, the court turns to the prejudice prong of the

inquiry.  "To establish actual prejudice, a petitioner must show 'not merely that the errors

at his trial created a *possibility* of prejudice, but that they worked to his *actual* and

substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'"

*Hollis*, 941 F.2d at 1480 (quoting *Frady*, 456 U.S. at 170).

> A petitioner shows prejudice due to ineffective assistance of counsel
> when "there is a reasonable probability that, but for counsel's unprofessional
> errors, the result of the proceeding would have been different.  A reasonable
> probability is a probability sufficient to undermine confidence in the
> outcome," but "a defendant need not show that counsel's deficient conduct
> more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at
> 694, 693.

*Hollis*, 941 F.2d at 1480.  The test used to evaluate claims of ineffective assistance of trial

counsel applies equally to an analysis of claims of ineffective assistance of appellate

counsel. *Jackson v. Dugger*, 931 F.2d 712, 715 (11th Cir. 1991).  "To determine whether

the failure to raise [or exhaust a claim] on direct appeal resulted in prejudice, [this court]

reviews the merits of the omitted claim.  If . . . the omitted claim would have had a

reasonable probability of success, then counsel's performance was necessarily prejudicial

because it affected the outcome of the appeal." *Eagle v. Linahan*, 279 F.3d 926, 943 (11th

Cir. 2001) (internal citation omitted).  This court will therefore review the merits of Hall's

substantive claims to determine whether his trial or appeal was infected with any error of

constitutional dimension that would establish prejudice sufficient to excuse his procedural default.

### a.      Chain of Custody

Hall argues that the State failed to establish a proper chain of custody for admission of the recording of the jailhouse conversation with fellow inmate Charles Osborne. Specifically, Hall maintains that the sheriff's department official responsible for physically downloading the recording from the recording device to the computer and CD did not testify at trial.   On direct examination by the prosecutor, Investigator Donovan Arias testified as follows:

> Q.      Would you tell the ladies and gentlemen—kind of explain the wire. In other words, is it, like, sitting in my pocket, this exposed?  Is that how it's done?
>
> A.      No.  The wire is a small box. . . .  And inside that box is a battery and a component, along with, like a memory card that will record anything —any conversation that's taking place.  It records it right inside the box.  There's a wire that comes out of the box that's an antenna that goes to—what we have is a listening box.
> On our listening box, basically, we have another recording device on there.  So, it's kind of redundant that we record it twice, just in case one goes out.
> The wire on the internal component that is attached to the person, like I said, has it[s] own memory card.  Any conversation that's taking place right now, if I were to have a wire on, that's going to record every conversation I have, along with—if Mr. Valeska had the box where he was listening to the conversation, he could also record there and listen at the same time.
>
> Q.      Is it fair to say, then, you used equipment with Charles Osborne, wired him up, and then he was sent back into the cell with who?
>
> A.      With Jimmy Earl Hall.

Q.     Now, would tell the ladies and gentlemen of the jury, did you check the equipment to see it if was working correctly?

A.     We did.

Q     And how would you do that?  How would you test it to see if what Charles Osborne was wearing under his clothing was working in relationship to what you could hear, as you indicated, the monitoring box, as well as the card that would have been in the individual device on him?  Correct?

A.     As I said, the wire itself, we have to download that afterwards.  We could not check it at the time.  At the time—when we attach the wire to the person, we can automatically hear it out of the listening box that we have with us.

Q.     So, could you tell the ladies and gentlemen of the jury, is there any way the person wearing the wire could cut it off, and if you were listening through your box, would you know that it was cut off or—

A.     We would.  Yes.

Q.     Can you tell the ladies and gentlemen of the jury, when you set up the equipment on Charles Osborne, III, and he went back in the pod with Jimmy Earl Hall, was the equipment working correctly?

A.     It was working perfectly.

Q.     You tested it?

A.     Yes.

Q.     And when Mr. Osborne was taken from wherever you had him in the jail, down the hall, through the cells, and the doors slammed, could you hear that?

A.     We can hear all that.

Q.     Okay.  And then, when he got in the cell with Jimmy Earl Hall, could you hear voices?

A.     We could.

24

Q.   Now, you were listening on the box?  Correct?

A.   We were.

Q.   You, [Sergeant] Rafferty, and who?

A.   And Sergeant Smith.  Jackie Smith.

* * *

Q.   Now, would you tell the ladies and gentlemen of the jury, when you talked to Osborne and Sergeant Jackie Smith and Sergeant Rafferty, did you or those two officers offer any inducement or reward in order to get him to wear a wire?

A.   No.

Q.   You're familiar he got 25 years on his theft cases?

A.   That's what I heard.  Yes.

Q.   All right.  And would you tell the ladies and gentlemen of the jury, did he ask for anything?

A.   No, he did not.

Q.   And when the wire was working and you heard the whole conversation, whose voices could you identify?

A.   I could identify Charles Osborne's and Jimmy Earl Hall.

Q.   And then, when the interview, if I could refer to, or the discussion was over, was a jailer sent down to get Osborne out of the cell?

A.   Yes.

Q.   And what was the occasion of taking him out of the cell from Jimmy Hall while he had the wire still on?  What was the purpose, if any?

A.   To get Charles Osborne out?

Q.      Yes, sir.

A.      The purpose was to get the wire back so we could download a recording off of it, and, of course, recover our equipment.

Q.      And would you tell the ladies and gentlemen of the jury, as you were listening to the wire, could you hear things completely that were taking place?

A.      Yes.

Q.      Now, tell the ladies and gentlemen of the jury, when you got Osborne back out of his cell, was he let go or let free?

A.      No, he was not.

Q.      Now, would you tell the ladies and gentlemen of the jury, when you got the device off Charles Osborne, is there any way he could have marked, altered or changed any of the content of the voices?

A.      No, he could not.

Q.      And when you got the recording device off and you said you downloaded it—help me a little bit.  Explain it to me.  I'm not a computer man.  Tell me what you did when you took the device off with the chip.

A.      Basically, the component has an area where you attach a wire that goes to a computer through a USB port on a computer, and it automatically downloads all that information off the wire itself.  From there[], it's burnt onto a disc.

Q.      Can you tell me, is there any way the equipment could malfunction?  In other words, you listened to the interview.  And as you listened to it and you made a disc, as you indicated, did you listen to the disc?

A.      I did.

Q.      I have some discs in front of you.  Would you tell me what numbers they are?

A.      One is number 149 and the other is 150.

Q.     And I believe there's other numbers on them.

A.     57 and 58.

Q.     Okay.  I think that's State's—

A.     Or is that S7 and S8?

Q.     Yeah.  State's 7 and State's 8 for identification purposes.  Would you tell the ladies and gentlemen of the jury which is State's 7?

A.     State's 7 says "Jimmy Hall statement."

Q.     And what's State's 8?

A.     Jimmy Hall wire.

Q.     And would that be the interview with Charles Osborne and Jimmy Earl Hall?  The conversations that took place?

A.     Yes.  State 8 would be the Jimmy Earl Hall and Charles Osborne.

Q.     And would you tell the ladies and gentlemen of the jury, after you downloaded, did you, as the detective, listen to the CD, in other words, after you downloaded it, and listen to the interview?

A.     I did.

Q.     And did the interview truly and accurately depict what you heard personally Osborne and Hall talk about?

A.     Yes, it did.

Q.     Was it marked, altered or changed in any way?

A.     No, it was not.

* * *

Q.     All right.  Would you tell the ladies and gentlemen of the jury, did you take custody of the original—of the discs that you downloaded, in other words, and keep that under your care, custody and control?

A.     I did.  It's in my case file.

Q.     And then, help me once again.  The original—if I say "chip," I don't mean chip.  But the device—

A.     No.  The original wire was downloaded by Sergeant Jackie Smith.

Q.     In the computer?

A.     Yes.

Q.     But my question it—was downloaded by Jackie Smith in the computer.  What I'm asking you is, would that still be in the computer or would that be erased?

A.     Sergeant Smith would have to answer that.  I personally do not know.

Q.     It is ordinary and customary that you would keep that?

A.     Normally, yes, it would be in there, unless, of course, there was some kind of malfunction with the computer where it got erased or something.  Normally it's all—

Q.     But you're not familiar with that, because a disc was made that night of the interview between—the conversations between Osborne and Jimmy Early Hall?  Correct?

A.     Yes.  Sergeant Smith made a copy and provided it to me.

Q.     And you listened to it?  Correct?

A.     I have.

Q.     And that's State's Exhibit No. 8 up there?

A.     Yes.  That's correct.

Q.     Okay.  And you listened to it—

28

A.      Yes, sir.

Q.      —in other words, again, since it was made that night, in other words, getting ready for court?  Correct?

A.      I've listened to it a few times.

Q.      Does it truly and accurately depict the interview between—I withdraw that, I keep saying "interview."   On State's Exhibit No. 8, the conversations between Jimmy Earl Hall and Charlie Osborne?

A.      Yes, it does.

Q       Hasn't been marked, altered, changed in any way?

A.      No.

Q.      Now, did you also make copies for the defense?

A.      We did.

Doc. 24-4 at 56–68.

Hall argues that the State failed to establish a proper chain of custody under applicable state law and that the admission of the recording of his conversation improperly prejudiced the trial proceedings.  "The chain of custody is composed of links.  A link is anyone who handled the item.  To show a proper chain of custody, the record must show each link and also (1) the receipt of the item, (2) the ultimate disposition of the item, i.e., transfer, destruction, or retention, and (3) the safeguarding and handling of the item between receipt and disposition." *Reynolds v. State*, 114 So. 3d 61, 118–19 (Ala. Crim. App. 2010) (internal citations and quotations omitted).  "While each link in the chain of custody must be identified, it is not necessary that each link testify in order to prove a

complete chain of custody." *Id.* (citing *Harrison v. State*, 650 So. 2d 603 (Ala. Crim. App. 1994)).

At trial, the State presented evidence that Investigator Arias was present when another law enforcement officer downloaded the recording from the wire device worn by Osborne to the computer and from the computer to a CD.   Arias testified he obtained possession of the CD upon its creation, listened to the CD, and determined that the CD contained an accurate recording of the conversation between Hall and Charles Osborne, which occurred on the night of May 9, 2010.   Arias further testified that the CD had not been altered or changed in any way since his receipt of the disc and had been kept in his case file prior to the time of trial.   Although Sergeant Smith did not testify, Investigator Arias during his testimony adequately identified this "link" in the chain of custody.   It is therefore clear that the State demonstrated a reasonable probability that there was no tampering with the recording on the CD.   Hall meanwhile has presented no evidence of any tampering.   At most, the infirmity about which Hall complains was no more than a weak link in the chain, not a break.   Thus, the court finds that the State established a proper chain of custody such that admission of the CD into evidence was proper.   Because the State laid a proper chain of custody at Hall's trial, there was no basis for a chain-of-custody objection by trial counsel.   Counsel is not ineffective for failing to assert a baseless or meritless objection. *See United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992).

### b.   Corroborating Evidence

Hall alleges that the State failed to produce evidence corroborating the testimony of

Charles Osborne.  On direct appeal, the Alabama Court of Criminal Appeals referenced the evidence contained on the recording of the conversation between Hall and Osborne.  The appellate court then found that Hall's lack of corroborating evidence claim was without merit because

> Osborne's testimony was sufficiently corroborated by the audio recording of his conversation with Hall.  That recording contained the substance of the material communication between Osborne and Hall.  From that recording, the jury could confirm Osborne's testimony that Hall solicited him to murder Peggy and that Hall intended for Osborne to act on that solicitation by burning down Peggy's house with her in it.  Therefore, Osborne's testimony was sufficiently corroborated, and, thus, the trial court did not err in denying Hall's motion for a judgment of acquittal.

Doc. 9-5 at 6.

As previously determined, the recording of the conversation between Hall and Osborne was properly admitted into evidence.  Since the Alabama Court of Criminal Appeals decided the lack-of-corroborating-evidence claim on the merits adversely to Hall by finding that the recording corroborated Osborne's testimony, this court's review of the claim is limited by the directives of § 2254(d)(1) and (2). *Price*, 538 U.S. at 638; *Williams*, 529 U.S. at 402.  When viewing the issue of corroborating evidence under the applicable restrictions, the decision of the Alabama Court of Criminal Appeals was not "contrary to" or "an unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d)(1). Similarly, Hall does not establish that the state court's decision constituted an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). Consequently, Hall is due no relief with respect to his claim alleging a lack of evidence to corroborate the testimony of Charles Osborne.  Since the lack of corroborating evidence

claim lacks merit, neither trial nor appellate counsel provided ineffective assistance with respect to the preservation of this claim. *See Winfield*, 960 F.2d at 974; *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001); *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000).

### c.    Prosecutorial Misconduct

Hall alleges that the prosecutor failed to provide him with copies of various documents prior to trial.  Specifically, Hall alleges that he did not receive a copy of a loan agreement he drafted, which is signed by him and Osborne and memorializes a potential loan by Hall to Osborne for payment of Osborne's bond; copies of various transcribed versions of the recording of his conversation with Osborne; a copy of a transcript of his own interview on May 10, 2016; a copy of a transcript of an interview with Osborne on May 9, 2010 during which Osborne first advised law enforcement officials of Hall's requests that he murder Peggy Shannon Hall; and a copy of a letter written in May 2010 by Osborne to Valeska wherein Osborne purportedly admits to prior drug use, reveals the sexual preference of his son, and references issues that could indicate a deterioration of his mental health.

While not explicitly stated by Hall, this claim arises in the context of *Brady v. Maryland*, 373 U.S. 83 (1963).  As articulated by the Eleventh Circuit:

> In *Brady v. Maryland*, the Supreme Court placed an affirmative duty on the prosecution to reveal any "evidence [that] is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.  This duty covers "[i]mpeachment evidence . . . as well as exculpatory evidence." *United States v. Bagley*, 473 U.S. 667, 676 (1985). The *Brady* rule applies to evidence possessed by the prosecution team, which

includes both the investigators and prosecutors. *See United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989).

Three elements establish a *Brady* violation: (1) the evidence must be favorable to the accused, because it is either exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice. *See Kelley v. Sec'y for Dep't of Corrs.*, 377 F.3d 1317, 1354 (11th Cir. 2004) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). *Brady* does not require that the prosecution "deliver [its] entire file to defense counsel, but only [that it] disclose" material evidence. *Bagley*, 473 U.S. at 675 (footnote omitted).

Evidence is prejudicially material only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). To meet this standard, "the defendant does not need to demonstrate that, after discounting the inculpatory evidence in light of the evidence in question, there would not have been enough evidence to convict him." *Taylor v. Singletary*, 122 F.3d 1390, 1395 (11th Cir.1997) (citation and quotation omitted). Instead, the defendant must show that the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*

*Stephens v. Hall*, 407 F.3d 1195, 1203–04 (11th Cir. 2005). "Evidence is not considered to have been suppressed if 'the evidence . . . itself proves that [the petitioner] was aware of the existence of that evidence before trial." *Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1334 (11th Cir. 2012).

It is undisputed that the State provided Hall a copy of the recording of his conversation with Osborne prior to trial, and thereby provided Hall the best evidence of the recorded conversation. Hall's assertion that the State was under a duty to provide him

copies of each transcript it prepared of the recording is without supporting authority and without constitutional merit.

In addition, it is likewise clear that the prosecutor could not be deemed to have suppressed evidence from Hall regarding a loan agreement Hall personally composed or the statements he made during his interview with law enforcement officers on May 10, 2010.[6] "[T]hat [Petitioner's] own statement to police was suppressed . . . is not *Brady* material. [Petitioner] was obviously present during this questioning and thus aware of anything he may have said. Evidence is not suppressed if the evidence itself proves that [the petitioner] was aware of the existence of that evidence before trial." *Boyd*, 697 F.3d at 1335 (internal quotations omitted).

With respect to the suppression of the transcript of the interview with Osborne and the letter written by Osborne to the prosecutor, the transcript of Osborne's interview and Hall's arguments regarding the letter indicate that no exculpatory evidence was contained in these materials. Nevertheless, assuming that Hall has shown suppression of evidence that could have been used for impeachment of Osborne's testimony regarding the contents of his interview, his mental health status while incarcerated, the sexual preference of his son, his own sexual preference, or prior drug use, Hall utterly and completely fails to show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. The alleged *Brady*

---

[6] The record establishes that, during his interview, Hall merely repeatedly denied having a conversation with Osborne regarding the solicitation of Peggy Shannon Hall's murder and asserted that any potential recording of such a conversation was "bullsh--." Doc. 18-8.

evidence was not material to the outcome of Hall's case because the evidence in question "could [not] reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.  Thus, Hall is not entitled to relief on his allegations of prosecutorial misconduct regarding the alleged suppression of evidence.

### 2.      *Fundamental Miscarriage of Justice*

The miscarriage of justice standard is directly linked to actual innocence. *Schlup v. Delo*, 513 U.S. 298 (1995).  Actual innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted.  *Id.* at 315.  The miscarriage of justice exception applies where a petitioner establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). "To establish actual innocence, [a habeas petitioner] must demonstrate that . . . 'it is more likely than not that no reasonable juror would have convicted him.'" *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup*, 513 U.S. at 327–328).  "[T]he Schlup standard is demanding and permits review only in the extraordinary case." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotations omitted).

"It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623–624.  *Schlup* observes that a claim that constitutional error has caused the conviction of an innocent person is extremely rare.  "To be credible, such a claim requires petitioner to support his allegations

of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.  Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324.

Hall argues he "is factually innocent and a miscarriage of justice has occurred . . . because the State failed to present any evidence of a crime, and it if [did], it presents [he] was entrapped by the inmate government agent." Doc. 36 at 3.  The record before the court refutes Hall's self-serving and conclusory allegation of actual innocence.  Moreover, Hall presents no "new reliable evidence" of his factual innocence, nor do his allegations suggest that any evidence exists that could satisfy the stringent standard set forth in *Schlup*.  Hall is therefore entitled to no relief from this court under the fundamental-miscarriage-of-justice exception.

**B.     Claims Adjudicated by the State Courts**

The state courts adjudicated Hall's claims regarding lack of a transcript and ineffective assistance of trial counsel adversely to him on the merits.  In addressing these claims in the Rule 32 proceedings, the trial court determined that Hall "is not entitled to a free transcript" for purposes of such proceedings and further held "the record establishe[d] that a transcript was prepared for his direct appeal." Doc. 9-1 at 22.  With respect to Hall's substantive challenges underlying his claim of ineffective assistance of trial counsel as to the lack of an objection to submission of the CD recording, the trial court held that Hall had provided no basis for a claim of ineffective assistance of trial counsel. Doc. 9-1 at 22.

The Alabama Court of Criminal Appeals affirmed this decision.  In so doing, the appellate court observed that "Hall [pled] only conclusions and [did] not specify what his cellmate said to him which amounted to entrapment." Doc. 9-2 at 3.  With respect to this allegation and Hall's argument that "if he was in legal custody, *Miranda* warnings should have been given[,]" the court determined that Hall failed to cite any authority regarding these claims and was therefore not entitled to relief on such claims. Doc. 9-2 at 3.  Finally, the court determined that "Hall also fail[ed] to advance any argument showing how his counsel's actions at trial amounted to ineffective assistance." Doc. 9-2 at 3.

In accordance with the directives of § 2254(d), a federal court may not grant habeas relief to a petitioner from a state court judgment unless adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In *Williams*, 529 U.S. at 412–13, the Supreme Court held that:

> Under the "contrary to" clause a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

The Court subsequently explained that habeas relief is appropriate when a petitioner demonstrates "that a decision by a state court is 'contrary to' . . . clearly established

[Supreme Court] law if it 'applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Price*, 538 U.S. at 640 (quoting *Williams*, 529 U.S. at 405–06).  Additionally, federal review in a habeas action "is limited to whether the state court's decision was objectively unreasonable in the light of clearly established federal law." *Hawkins v. Alabama*, 318 F.3d 1302, 1310 (11th Cir. 2003) (citing *Williams*, 529 U.S. at 409).  Moreover, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410.  "Clearly established federal law is *not* the law of the lower federal courts, including this court.  Instead, in the habeas context, clearly established federal law 'refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state court decision.'" *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) (quoting *Williams*, 529 U.S. at 412).

The law is well established that:

§ 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. 529 U.S. at 404–405.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in [United States Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts. *Id.* at 405–406.  The [district] court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case. *Id.* at 407–408.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one. *Id.* at 409–410.

*Bell v. Cone*, 535 U.S. 685, 694 (2002).

Section 2254(d) bars relitigation of any claims adjudicated on the merits in state court, subject only to the exceptions in §§ 2254(d)(1) and (2).  Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning. *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Cullen v. Pinholster*, 563 U.S. 170, 187–88 (2011) ("Section 2254(d) applies even where there has been a summary denial.").  "If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with the Court's precedents.  It goes no further." *Harrington*, 562 U.S. at 102–03 (citations omitted).

Federal district courts are likewise directed to determine whether the state court based its findings on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the [state] trial court's . . . determination.'" *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341–342 (2006)).

A state court's determinations of fact shall be "presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  However, even when the state court addresses a question of law, this court is not authorized "to evaluate [a petitioner's] claim *de novo* rather than through the lens of § 2254(d)." *Price*, 538 U.S. at 639.  The Supreme Court admonishes that such *de novo* evaluation "exceeds the limits imposed on federal habeas review by 28 U.S.C. § 2254(d)[.]" *Id.* at 636.

### 1.    *Lack of Transcript*

In *Griffin v. Illinois*, 351 U.S. 12 (1956), the Supreme Court established the now-familiar principle that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has" and determined that provision of a free transcript to an indigent defendant is therefore required on direct appeal.  It is undisputed that the State provided Hall, through his appellate counsel, a free transcript for use on direct appeal.  This is all that is required of the State.

In addition, this court previously determined that Hall suffered no prejudice from the lack of a transcript either to proceed on direct appeal or for purposes of a Rule 32 proceeding as the claim raised on appeal and those presented after receipt of the transcript fail to demonstrate any error of constitutional dimension.  Since the omitted claims did not have a reasonable probability of success, appellate counsel's failure to provide Hall a transcript to pursue these claims was not prejudicial and did not constitute ineffective assistance.

### 2.    Ineffective Assistance of Trial Counsel

The Sixth Amendment right to counsel exists to protect the fundamental right to a fair trial.  The clearly established federal law addressing issues of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner must satisfy the requirements of a two-pronged test to prevail on his claims of ineffective assistance of counsel.  First, the petitioner must establish that the performance of his attorneys "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  Once this threshold test is met, the petitioner must then show that the deficient performance of his counsel prejudiced his defense. *Id.* at 687.  To establish prejudice, the petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In addressing the claims raised in Hall's Rule 32 petition, the trial court determined that: (a) its records indicated Hall was in custody on a probation revocation for a 2006 unlawful possession of a controlled substance offense at the time Osborne recorded the conversation with Hall; (b) recording of the conversation did not implicate any violation of the Fourth Amendment; and (c) the recording did not violate Hall's right against self-incrimination or his right to counsel because he had not been charged with solicitation to commit murder when he made the incriminating statements to Osborne. Doc. 9-1 at 22–23.  The Alabama Court of Criminal Appeals affirmed the decision of the trial court on these issues and also determined that Hall failed to "specify what his cellmate said to him which amounted to entrapment" and cited no authority regarding this claim. Doc. 9-5 at 3.

The appellate court determined that Hall waived the entrapment claim since he presented no evidence or legal authority to support this claim. Doc. 9-5 at 3.

In *United States v. White*, 401 U.S. 745 (1971), the United States Supreme Court set forth the well-established legal principle that the Constitution does not require a warrant before conversations are overheard or recorded by law enforcement officials when done with the consent of one of the parties to the conversation. Under *White*, "the fourth amendment is not violated through the warrantless use of a radio transmitter [or recorder] concealed on the person of an informer with the informer's consent. . . . White clearly holds that the interception of conversations between a confidential informant and a defendant, monitored without [a] warrant, but which conversations were intercepted [and recorded] with the knowledge and consent of the confidential informant, does not violate the [petitioner's] fourth amendment right to be secure against unreasonable searches and seizures." *Watts v. Graves*, 720 F.2d 1416, 1419 (5th Cir. 1983); *United States v. Smith*, 918 F.2d 1551, 1558 (11th Cir. 1990) (citing *White*, 401 U.S. 745) ("The admission into evidence of recorded conversations between a defendant and a consenting government informant does not violate the Fourth Amendment right of the accused.").

With respect to the elicitation of incriminating statements from a defendant in violation of his Sixth Amendment right to counsel and the concomitant right established by *Miranda*, the Supreme Court has determined that:

> "The Sixth Amendment prohibits admission of statements deliberately elicited by the government from the defendant *after adversary criminal proceedings have begun*, unless the defendant's counsel is present or the defendant waives his right to counsel." *United States v. Gunn*, 369 F.3d 1229,

> 1237 (11th Cir. 2004) (per curiam) (citing *Massiah v. United States*, 377 U.S. 201, 206–07 (1964)).   *This right to counsel is specific to the particular offense charged*. *Texas v. Cobb*, 532 U.S. 162, 167–68 (2001).

*United States v. Johnson*, 450 F. App'x 878, 882 (11th Cir. 2012) (emphasis added).

At the time Osborne elicited statements from Hall, Hall was incarcerated pursuant to a sentence imposed upon him in May 2009 regarding a controlled substance offense committed in 2006.  Hall had also previously entered a guilty plea to the misdemeanor offense of criminal mischief and trespass.  Prior to the recording of the conversation, law enforcement officials were not investigating Hall for solicitation to commit murder and he had not been charged with this offense.  Thus, at the time Osborne recorded the conversation with Hall, Hall's Sixth Amendment right to counsel had not attached to the offense of criminal solicitation to commit murder.  The incriminating statements therefore do no fall with the protection of Hall's right to counsel or his right against self-incrimination. *See id*.

With respect to the allegation of entrapment, two separate issues of fact are relevant: (1) whether there was government inducement; and (2) whether the defendant was predisposed to commit the offense charged. *Ruggs v. State*, 601 So. 2d 508, 510–11 (Ala. Crim. App. 1992).  During his testimony, Hall denied any solicitation for murder and testified that he merely requested that Osborne burn down a children's playhouse on his property. Doc. 24-7 at 59–60.  In his pleadings before both the state courts and this court, Hall makes the conclusory and unsupported allegation that he was "entrapped" by Charles

Osborne.  Hall presents no facts to support this allegation, and the record clearly refutes this claim.

This court has undertaken a thorough and exhaustive review of the trial transcript, the evidentiary materials contained in the record, the opinions issued by the state courts, and controlling federal law.  After this review, the court concludes that the state courts did not decide Hall's claims of ineffective assistance of trial counsel or the claims underlying counsel's alleged ineffectiveness "differently than [the Supreme] Court has [in a case based] on a set of materially indistinguishable facts," nor did the state court apply a rule that contradicts governing federal law. *Williams*, 362 U.S. at 412.  Consequently, rejection of these claims by the state courts was not contrary to actual Supreme Court decisions or violative of clearly established federal law as determined by the Supreme Court.  Moreover, under the circumstances of this case, the decisions of the state courts were objectively reasonable and likewise constituted a reasonable determination of the facts in light of the evidence presented to the state courts.  As addressed herein, the allegations on which Hall predicated his claim of ineffective assistance of counsel—absence of custody, Fourth and Sixth Amendment violations, and entrapment—lack merit.  Thus, Hall is not entitled to relief from this court on his claim of ineffective assistance of trial counsel.

**C.    Prosecutor's Assertion that Osborne's Interview Was Not Transcribed**

Hall complains that when the prosecutor introduced the recording of Charles Osborne's interview into evidence he stated that the recoding "was not" transcribed. Doc. 24-6 at 31.  Hall produced a transcript of Osborne's interview, which indicated the

prosecutor had a copy of the transcript, Doc. 18-5 at 1–15, and argues that the prosecutor was therefore untruthful in advising the court that no transcript existed. Doc. 18 at 7.

Statements and remarks made by a prosecutor who is "wrapped in the cloak of state authority have a heightened impact on the jury.  For this reason, misconduct by the prosecutor . . . must be scrutinized carefully." *Drake v. Kemp*, 762 F.2d 1449, 1459 (11th Cir. 1995).  However, "improper or erroneous prosecutorial remarks provide no basis for federal habeas relief unless the remarks rendered the petitioner's trial fundamentally unfair."  *Cargill v. Turpin*, 120 F.3d 1366, 1379 (11th Cir. 1997) (internal citation and quotation marks omitted).  To establish fundamental unfairness, a petitioner must show that the improper comment was "so egregious as to create a reasonable probability that the outcome was changed because [of the comment]. . . .  A 'reasonable probability' is one sufficient to undermine confidence in the outcome." *Id.*  "If a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair." *Tucker v. Kemp*, 802 F.2d 1293, 1296 (11th Cir. 1986).

The court has reviewed the remark made by the prosecutor regarding lack of a State-prepared transcript of the recording of Osborne's interview in the context of the evidence as a whole.  Unquestionably, there is no reasonable probability that the prosecutor's remark in any way impacted the decision of the jury.  This court is confident that, absent the prosecutor's improper remark, the jury's decision to convict Hall would have been no different.  Hall is therefore entitled to no relief on this claim.

**D.      Actual Innocence**

With respect to Hall's allegation that he is actually innocent of solicitation to commit murder, he is entitled to no relief.  The law is well-settled that a claim of actual innocence has "never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002) (quoting *Herrera*, 506 U.S. at 400).  In accordance with the foregoing directives and under the circumstances of this case as set forth herein, Hall is entitled to no relief from this court on any independent claim of actual innocence.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the undersigned Magistrate Judge that the 28 U.S.C. § 2254 petition for habeas corpus relief filed by Jimmy Earl Hall be DENIED, and this case be DISMISSED with prejudice.

It is further ORDERED that, on or before **September 23, 2016**, the parties may file objections to the Recommendation.  A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made.  Frivolous, conclusive, or general objections to the Recommendation will not be considered.  Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a *de novo* determination by the district court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district

court's order based on unobjected-to factual and legal conclusions accepted or adopted by the district court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11th Cir. R. 3-1; *see Stein v. Lanning Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982).

DONE this 2nd day of September, 2016.

                                                        /s/ Gray M. Borden
                                          UNITED STATES MAGISTRATE JUDGE